### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE


Potts NH RE, LLC

    v.                                    Civil No. 12-cv-82-SM

Northgate Classics, LLC
d/b/a Northgate, LLC


### REPORT AND RECOMMENDATION


Before me for a report and recommendation is plaintiff's motion for a preliminary injunction.  Defendant objects.  The court held a hearing on the motion on May 4, 2012.  For the reasons that follow, I recommend that plaintiff's motion be denied.


### Background

The factual background for this order is drawn from: (1) the parties' joint statement of facts, document no. 28; (2) various affidavits the parties have submitted; and (2) the testimony and exhibits presented at the hearing.  Regarding those exhibits, all are admitted.

In 2006, Keystone Management Company ("Keystone") loaned $700,000 to Belmont Track RE, LLC ("Belmont Track").  Belmont Track owned a property in Belmont, New Hampshire ("the property"), that was once operated as Lakes Region Greyhound

Park.  The loan agreement includes the following relevant

provision:

> 4. **COVENANTS OF THE BORROWER**.  Until payment in full
> of all sums required to be paid by the Borrower under
> the Note, and pursuant to the provisions of this
> Agreement or any Security Instrument, the Borrower
> shall
>
> . . . .
>
> (f)  Do or cause to be done all things necessary
> to preserve, renew and keep in full force and
> effect its existence, rights, licenses, permits
> and franchises and comply with all laws and
> regulations applicable to them.

Def.'s Mem. of Law, Ex. A (doc. no. 10-1), at 3-4.[1]  The

"Borrower" referred to in the foregoing provision is Belmont

Track.

To secure repayment of the loan it received from Keystone,

Belmont Track gave Keystone a mortgage on the property.  The

mortgage required Belmont Track to insure the property and to

provide Keystone with evidence that it was paying its insurance

---

[1] Potts objected to the admission of the loan agreement
(Def.'s Ex. B), as well as four other of Northgate's exhibits
(Def.'s Exs. C-F).  The court took under advisement each of
Potts's objections.  Attorney Tarbell's testimony at the hearing
concerning the provenance of those documents is sufficient to
establish their authenticity.  See Fed. R. Ev. 901.  In any
event, in light of the court's determination that Northgate's
reliance on Section 4(f) of the loan agreement is unavailing,
for reasons explained later in this order, Potts is not
prejudiced by the admission of that document.  With respect to
the other four exhibits (Def.'s Exs. C-F), Potts suffers no
prejudice as the court does not rely on any of them in reaching
its decision.

premiums and property taxes.  The mortgage also includes the
following provision:

> The Mortgager [Belmont Track] shall reimburse the
> Mortgagee for, and there shall be secured by this
> Mortgage, all sums which the Mortgagee shall advance
> for insurance, taxes, liens, assessments, legal fees,
> or other expenses which the Mortgagee shall deem
> necessary for the protection or preservation of the
> Premises, and the Mortgagee's interest therein,
> together with interest on such sums at the same rate
> as provided in the Loan Agreement or the Note.

Def.'s Mem. of Law, Ex. B (doc. no 10-2), at 1-2.

Belmont Track leased the property to Belmont Gaming, LLC.
Marlin Torguson was a principal in both Belmont Track and
Belmont Gaming.  Belmont Gaming operated a business on the
property known as the Lodge at Belmont.

In March of 2011, Northgate LLC ("Northgate") purchased the
note Belmont Track gave Keystone, and Keystone assigned its
interest in the mortgage to Northgate.  By that point, the
property was subject to: (1) two more mortgages (one held by
Potts NH RE, LLC ("Potts")); (2) an attachment; and (3) two tax
liens.  Between May and October of 2011, Northgate made eleven
payments to Torguson that it characterized as "principal
advances."  Those payments total more than $200,000 and perhaps
as much as $270,000.[2]

---

[2] The parties appear to dispute both the number of
"principal advances" Northgate made and the total amount of
those "advances."  At this point, it is unnecessary to resolve
that dispute.

In December of 2011, Potts foreclosed on the mortgage it held on the property, and purchased the property at the resulting sale.  Potts now owns the property, and leases it to various "Potts affiliates that currently operate charitable gaming and other businesses at the Property."  Pl.'s Reply, Newman Aff. (doc. no. 15-1) ¶ 19.

Immediately after Potts made its successful bid for the property, a representative of Northgate handed Craig Potts, a principal in Potts, a letter expressing Northgate's belief that its mortgage secured repayment of not just the $700,000 it loaned Belmont Track (plus accrued interest), but also secured repayment of the eleven "principal advances."  Shortly thereafter, Potts attempted to pay off the note and have Northgate discharge the mortgage.  Specifically, Potts offered to pay approximately $1,020,571, representing the unpaid principal balance on the note plus interest.  Northgate refused Potts's proffer, contending that it was also owed reimbursement for the eleven "principal advances."

This action followed.  In Count I, Potts petitions for a release of Northgate's interest in the property, pursuant to section 479:10 of the New Hampshire Revised Statutes Annotated ("RSA").  In Count II, Potts seeks relief under the New Hampshire Consumer Protection Act, RSA chapter 358-A.  In addition, Potts has moved for preliminary injunctive relief.

4

Specifically, it asks the court to order Northgate to accept its
tender of $1,027,015.19 and to release its liens on the
property.

### The Legal Standard

"A preliminary injunction is an extraordinary and drastic
remedy that is never awarded as of right."  Peoples Fed. Sav.
Bank v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012)
(quoting Voice of the Arab World, Inc. v. MDTV Med. News Now,
Inc., 645 F.3d 26, 32 (1st Cir. 2011)).  The following standard
governs a trial court's consideration of a request for a
preliminary injunction:

> In order for a court to grant this type of relief, a
> plaintiff "must establish [1] that he is likely to
> succeed on the merits, [2] that he is likely to suffer
> irreparable harm in the absence of preliminary relief,
> [3] that the balance of equities tips in his favor,
> and [4] that the injunction is in the public
> interest."  [Voice of the Arab World, 645 F.3d at 32]
> (quoting Winter v. Natural Res. Def. Council, Inc.,
> 555 U.S. 7, 20 (2008)).  Generally, "[w]hile all these
> factors must be weighed, the cynosure of this four-
> part test is . . . the movant's likelihood of success
> on the merits."  Borinquen Biscuit Corp. [v. M.V.
> Trading Corp.], 443 F.3d [112,] 115 [(1st Cir. 2006)].

Peoples Federal, 672 F.3d at 9 (parallel citation omitted); see
also Esso Std. Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18
(1st Cir. 2006) ("The party seeking the preliminary injunction
bears the burden of establishing that these four factors weigh

in its favor.") (citing <u>Nieves-Márquez v. Puerto Rico</u>, 353 F.3d 108, 120 (1st Cir. 2003)).

"[T]he first two . . . factors . . . weigh heaviest in the analysis." <u>Braintree Labs., Inc. v. Citigroup Global Mkts. Inc.</u>, 622 F.3d 36, 41 (1st Cir. 2010) (citing <u>González-Droz v. González-Colon</u>, 573 F.3d 75, 79 (1st Cir. 2009)).  Moreover, the second factor, irreparable harm, is an "essential prerequisite for equitable relief," <u>Braintree</u>, 622 F.3d at 41; <u>see also</u> <u>Voice of the Arab World</u>, 645 F.3d at 32 ("The [Supreme] Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.") (quoting <u>Weinberger v. Romero-Barceló</u>, 456 U.S. 305, 312 (1982); citing 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 2948.1, at 139 (2d ed. 1995)).

In addition, the first two factors operate on a sliding scale, such that "a movant can show somewhat less in the way of irreparable harm" when "the likelihood of success on the merits is great." <u>Vaquería Tres Monjitas, Inc. v. Irizarry</u>, 587 F.3d 464, 485 (1st Cir. 2009) (quoting <u>EEOC v. Astra USA, Inc.</u>, 94 F.3d 738, 743 (1st Cir. 1996) (citing <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 19 (1st Cir. 1996); <u>Gately v. Massachusetts</u>, 2 F.3d 1221, 1232 (1st Cir. 1993)).  But, even though a strong showing on likelihood of success can make up for

some weakness in a plaintiff's showing of irreparable harm, "at least some positive showing of irreparable harm must still be made." Braintree, 622 F.3d at 43.  That is, "a federal court cannot dispense with the irreparable harm requirement in affording equitable relief." Gately, 2 F.3d at 1232.

Because Potts "does not seek a traditional, prohibitory preliminary injunction, but instead asks for a mandatory preliminary injunction, which requires affirmative action by [Northgate] in advance of trial," Braintree, 622 F.3d at 40-41, the injunction it seeks "should be granted only . . . [if] the exigencies of the situation demand such relief," id. at 41 (quoting Mass. Coal. Of Citizens with Disabilities v. Civil Def. Agency, 649 F.2d 71, 76 n.7 (1st Cir. 1981)); see also RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1208-09 & n.3 (10th Cir. 2009) (describing as "disfavored" both mandatory preliminary injunctions and those that would give the movant all the relief that would result from a victory at trial, but holding that such injunctions may be granted when a movant meets the heightened burden of establishing exigencies that require extraordinary interim relief).  That said, the "exigencies [of the situation] should still be measured according to the same four-factor test, as '[t]he focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.' " Braintree, 622 F.3d at 41 (quoting Crowley v. Local No. 82,

Furn. & Piano Moving, Furn. Store Drivers, 679 F.2d 978, 996

(1st Cir. 1982)).

## Discussion

According to Potts, each of the four factors described in

Peoples Federal weighs in its favor.  Northgate disagrees,

categorically.  Based on the evidence developed at the hearing,

and beforehand, the court concludes that while Potts has made a

solid showing of likelihood of success on the merits, it has not

established that it will suffer irreparable harm if the court

does not grant the injunctive relief it seeks.

A. Likelihood of Success on the Merits of Count I

In Count I, Potts petitions for relief under RSA 479:10.

That statute provides:

> **Petition for Release.**  If after such performance
> or payment, or a legal tender thereof, the mortgagee,
> being duly requested and having his reasonable charges
> therefor tendered to him, shall refuse or neglect to
> execute a release of his interest in the mortgaged
> premises, the mortgagor or person having his estate
> may apply by petition to the superior court in the
> county where the mortgaged estate or the greater part
> thereof lies stating the conveyance of the estate, the
> condition of the conveyance and the performance,
> payment or tender thereof, and praying for a decree of
> discharge or other relief.

RSA 479:10.

Potts argues that it has a substantial likelihood of

success on the merits of its claim that it made a legal tender

of the full payment due under the note, which required Northgate
to release its interest in the property.  Specifically, Potts
contends that: (1) the obligation to repay the "principal
advances" is not secured by Northgate's mortgage because the
amount of those advances exceeds the $700,000 maximum principal
amount of the note; and (2) even if an obligation to repay the
"principal advances" had been secured by the mortgage, "New
Hampshire mortgage law clearly provides that advances in excess
of the maximum principal amount do not take priority over
intervening junior mortgages, such as the mortgage Potts NH
foreclosed when it took possession of the Property."  Pl.'s Mem.
of Law (doc. no. 3-1), at 4 (citing RSA 479:3)).  In response,
Northgate argues that Potts cannot meet its burden of
demonstrating a likelihood of success on the merits because the
"principal advances" were made to protect or preserve the
property, which means that their repayment was secured by the
mortgage.  Northgate further argues that Potts's reliance on RSA
479:3 is misplaced because the New Hampshire Supreme Court has
yet to construe that statute in a case that is factually
analogous to this one.

    In determining Potts's likelihood of success on the merits,
the pivotal question is whether the mortgage Northgate holds
secures an obligation to repay the "principal advances."  The
mortgage obligates the mortgagor to reimburse the mortgagee for

advances made by the mortgagee "for insurance, taxes, liens, assignments, legal fees, or other expenses which the Mortgagee shall deem necessary for the protection or preservation of the Premises, and the Mortgagee's interest therein."  Def.'s Mem. of Law, Ex. B, at 2.  To support its contention that the "principal advances" were necessary to protect or preserve its interest in the property, Northgate produced the affidavit of its principal, Charles Underbrink, who stated, in pertinent part:

> From May 19, 2011 to October 21, 2011 Northgate made eleven advances to Belmont[3] for [the] purpose of protecting and preserving the assets and collateral.
>
> At different times I was contacted by Rick Newman, known to me as the manager of the Belmont operations, Dennis Lavalle and Marlin Torguson, the principal of Belmont requesting Northgate advance funds to Belmont to preserve and protect the assets and property.
>
> Northgate never made advances to Marlin Torguson as alleged in paragraph 13 of the Complaint.  Any funds provided by Northgate were to Belmont for the purpose of protecting and preserving the collateral and its value. . . .[4]
>
> I was advised [that] each advance was necessary to preserve and protect the value of the facility.

---

[3] Underbrink used the term "Belmont" to denote "Belmont Track."  Def.'s Mem. of Law, Ex. C (doc. no. 10-3) ¶ 2.

[4] Notwithstanding Underbrink's averment that Northgate advanced funds to Belmont Track rather than Torguson, the spreadsheet Underbrink presented to Potts's counsel to verify the amount due on the note listed eleven payments each described as a "principal advance" to a payee identified as "Torguson." Compl., Ex. 6 (doc. no. 1-6), at 3.

Def.'s Mem. of Law, Ex. C (doc. no. 10-3) ¶¶ 6-9.  Northgate

also produced an affidavit from Torguson's banker, Dennis

Lavalle, who stated, in pertinent part:

> On a number of occasions I was contacted by Rick
> Newman who was employed at the Lodge at Belmont
> regarding the need for additional funds to protect the
> assets and property.

> I also had conversations with Marlin Torguson
> regarding the same need for additional funds to
> protect and preserve the assets.

> In response to these calls from Mr. Newman, I
> contacted Charles Underbrink urging him to make
> additional advances for the purpose of saving the
> collateral.

Def.'s Mem. of Law, Ex. E (doc. no. 10-5) ¶¶ 2-4.

While both Underbrink and Lavalle spoke of protecting and

preserving the property that secured the repayment of the loan

to Belmont Track, they said nothing about how they imagined

Northgate's advances would be used to achieve that end.  In

other words, those affidavits offer legal conclusions but no

evidence of any knowledge that would have made it reasonable for

Underbrink or Lavalle to believe that Northgate's payments would

have protected or preserved its interest in the property.  That

is not enough to satisfy the "deem necessary" requirement in the

mortgage.  As Potts pointed out at the hearing, Northgate's

approach to the "deem necessary" requirement would give a

mortgagee a virtually unlimited ability to secure loans to

mortgagors (or, as in this case, strangers to the mortgage) that

have no relation to the protection or preservation of the collateral at issue simply by deeming any subsequent loan to have that purpose.

In contrast with Underbrink and Lavalle, Belmont Gaming's general manager, Rick Newman, gave credible detailed testimony at the hearing that described the relationship between Belmont Track and Belmont Gaming, the process by which he requested funds from Torguson to meet Belmont Gaming's payroll, and the uses to which Belmont Gaming put the "advances" that were made by Northgate.  Moreover, he produced general ledgers from Belmont Gaming showing that on nine occasions, a payment listed as a "principal advance" to Torguson was immediately followed by a wire transfer, in the same amount, from Northgate into Belmont Gaming's general operating account.

Perhaps recognizing the futility of arguing against the facts showing that Northgate's "principal advances" to Torguson went directly into Belmont Gaming's operating account rather than to the entity that owned the property,[5] Northgate attempted

_____

[5] While Northgate argues that its deposit of "principal advances" into Belmont Gaming's bank account rather than Belmont Track's account "appears to have been an established business practice of no consequence to the issues at hand," Def.'s Surreply (doc. no. 18), at 3, the court cannot be so cavalier. Had Northgate intended to protect or preserve its interest in the property, it could have made advances to its mortgagor rather than to its mortgagor's lessee.  After all, under the mortgage, it was Belmont Track, not Belmont Gaming, that owed Northgate a duty to insure the property and to provide evidence

to demonstrate at the hearing that maintenance of Belmont Gaming as a going concern was somehow a way of protecting and preserving its interest in the property owned by Belmont Track, on which Belmont Gaming operated the Lodge at Belmont. Northgate goes even further in its memorandum of law, arguing that "Potts, as the current owner of the Property, has benefitted from the payment of these advances."  Def.'s Mem. of Law (doc. no. 10), at 7.  The problem is that Northgate does not explain how Potts benefitted from infusions of cash that helped Belmont Gaming's business stave off insolvency, nor does it explain how those infusions of cash protected or preserved the property, as opposed to the business Belmont Gaming was operating on the property.[6]

Northgate devotes considerable attention to the language in the loan agreement obligating Belmont Track to do all things necessary to preserve its existence, rights, licenses, and the like.  But, the existence of Belmont Track is not the same thing as the existence of its lessee, Belmont Gaming, which was the beneficiary of the "advances" from Northgate.  Beyond that, even

that insurance premiums and property taxes had been paid.  See Def.'s Mem. of Law, Ex. A, at 1-2.

[6] In this regard, there was testimony at the hearing that the property was shuttered at the time Belmont Track purchased it, which suggests that the property has value even when it is not being used.

accepting Northgate's assertion that its "advances" helped
Belmont Gaming avoid wage claims from employees and, perhaps,
other legal problems that might have imperiled its licensure,
Northgate has produced <u>no</u> evidence that any of the things its
"advances" helped prevent would have resulted in any encumbrance
on Belmont Track's title to the property.  And that is the
extent of Northgate's interest under the mortgage.[7]  Northgate's
theory seems to be that it made its "principal advances" to help
Belmont Gaming remain in business which, in turn, helped Belmont
Gaming make its lease payments to Belmont Track, which, in turn,
helped Belmont Track repay the loan.  That may all be true but,
in the end, acting to protect and preserve its interest in
getting repaid by Belmont Track is not the same thing as acting
to protect and preserve the collateral securing its right to
repayment.

The inescapable conclusion is that the "principal advances"
Northgate seeks to recover from Potts are not expenses Northgate
reasonably deemed necessary to protect or preserve the property
and Northgate's interest therein.  Thus, it would appear that

---

[7] To the extent that Belmont Gaming's licenses and permits
are even relevant, Craig Potts testified that Potts did not
acquire any licenses or permits when it purchased the property,
which would certainly seem to poke a hole in Northgate's
argument that Potts, as a subsequent owner of Belmont Track's
property, benefitted from the money Northgate funneled into
Belmont Gaming.

Potts has a likelihood of success on the merits of its claim
that the obligation to repay those "advances" is not secured by
the mortgage Belmont Track gave Keystone.  Finally, because the
repayment Northgate seeks appears not to be secured by the
mortgage in the first instance, it would seem unnecessary to
reach the legal questions the parties have identified regarding
the application of RSA 479:3 to the circumstances of this case.

B. Irreparable Harm

     As discussed above, Potts has made a strong showing of
likelihood of success on the merits which, in turn, somewhat
diminishes the showing it must make on the irreparable-harm
factor, see Vaquería, 587 F.3d at 485, on which it bears the
burden of proof, see Ross-Simons, 102 F.3d at 18 (citing
Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir.
1991)).  Even in light of Potts's somewhat diminished burden of
proof, however, the court is unable to identify facts in the
record that would support the issuance of the injunction Potts
seeks.  See Francisco Sánchez v. Esso Std. Oil Co., 572 F.3d 1,
14 (1st Cir. 2009) ("[a] court granting a preliminary injunction
must set forth the findings of fact and conclusions of law
supporting its issuance") (citing Fed. R. Civ. P. 52(a)(2)).

     At the outset, Potts focused its irreparable-harm argument
on the degree to which the outstanding mortgage limits its

ability to raise money to develop the property.  Potts argues,
in addition, that the loss of enjoyment of real property
constitutes irreparable harm.  In response, Northgate: (1)
questions the factual basis for some of the irreparable harm
claimed by Potts; (2) contends that Potts could avoid any
irreparable harm by agreeing to a compromise it has proposed
under which it would discharge the mortgage in exchange for
Potts paying the amount it does not dispute and depositing the
amount it disputes with the court for distribution after trial;[8]
(3) argues that Potts's claimed harms are too speculative to
entitle it to the injunctive relief it seeks; (4) faults Potts
for failing to satisfy the three-part test for irreparable harm
described in Ross-Simons, 102 F.3d at 19; and (5) rejects
Potts's argument based on the loss of the full enjoyment of its
real property.  Potts has failed to establish irreparable harm
based on either lost business opportunities or loss of the
enjoyment of its real property.

---

[8] At the hearing, Craig Potts also floated the idea of
giving Northgate a personal guarantee in the amount of the
disputed "principal advances" in exchange for a discharge of the
mortgage.  If Potts were to amend its complaint to request a
declaratory judgment on the question of Northgate's entitlement
to the disputed amount, a procedural posture that could actually
result in a judgment in Northgate's favor, then, perhaps, the
personal guarantee would alleviate Potts's need for a
preliminary injunction.

A. Loss of Business Opportunities

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005) (citing Wright, Miller & Kay, supra, § 2948.1, at 149).  Thus, "it has long been held that traditional economic damages can be remedied by compensatory awards, and thus do not rise to the level of being irreparable." Vaquería, 587 F.3d at 485 (citing P.R. Hosp. Supply, Inc. v. Boston Sci. Corp., 426 F.3d 503, 507 (1st Cir. 2005)).  Even so,

> it has also been recognized that some economic losses can be deemed irreparable.  For instance, "an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1382 (6th Cir. 1995) (citing Doran v. Salem Inn, Inc., 422 U.S. 922, 932 (1975) (finding no abuse of discretion in determination that "absent preliminary relief [movants] would suffer a substantial loss of business and perhaps even bankruptcy")); see also Nat'l Screen Serv. Corp. v. Poster Exchange, Inc., 305 F.2d 647 (5th Cir. 1962) (affirming grant of preliminary injunction where denial of injunctive relief would result in the destruction of movant's business).
>
> In addition, we have held that the irreparable harm requirement may be met upon a showing that "absent a restraining order, [a party] would lose incalculable revenues and sustain harm to its goodwill." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996).  In addition, in Automatic Radio Mfg. Co. v. Ford Motor Co., we

> suggested that the inability to supply a full line of
> products may irreparably harm a merchant by shifting
> purchasers to other suppliers.  390 F.2d 113, 116–17
> (1st Cir. 1968).

Vaquería, 587 F.3d at 485 (parallel citation omitted).

The Ross-Simons court, in turn, identified two guideposts for calculating the quantum of harm that will justify preliminary injunctive relief:

> In the first place, the plaintiff's showing must
> possess some substance; a preliminary injunction is
> not warranted by a tenuous or overly speculative
> forecast of anticipated harm.  See Narragansett Indian
> Tribe, 934 F.2d at 6–7; Public Serv. Co. v. Town of W.
> Newbury, 835 F.2d 380, 383 (1st Cir. 1987).  In the
> second place, an attempt to show irreparable harm
> cannot be evaluated in a vacuum; the predicted harm
> and the likelihood of success on the merits must be
> juxtaposed and weighed in tandem.  See Astra USA, 94
> F.3d at 743 (explaining that the greater the
> likelihood of merits success, the less that is
> required in the way of irreparable harm); Gately v.
> Commonwealth of Mass., 2 F.3d 1221, 1232 (1st Cir.
> 1993) (noting the same phenomenon and suggesting that
> irreparable harm is subject to a "sliding scale"
> analysis).

102 F.3d at 19.[9]

In Ross-Simons, the court of appeals affirmed the district court's determination that without a restraining order requiring the defendant distributor to continue supplying Baccarat crystal

---

[9] As a point of clarification, notwithstanding Northgate's characterization of Ross-Simons, that opinion does not impose any additional burden on a party seeking preliminary injunctive relief.  Instead, it provides direction for courts faced with such requests and identifies two guideposts they might use, rather than, as Northgate argues, establishing three factors a movant must prove.  See 102 F.3d at 19.

to the plaintiff retailer, the plaintiff "would lose

incalculable revenues and sustain harm to its goodwill."  102

F.3d at 19.  The court based its ruling on two factual findings

by the district court:

> First, due to the uniqueness of Baccarat crystal,
> Ross-Simons could not simply replace the Baccarat line
> with some other brand, and, without the availability
> of Baccarat, its bridal registry business would
> suffer.  The resultant damage, including lost sales of
> other registry items, alienation of future
> registrants, and harm to its reputation, would defy
> accurate quantification.  Second, when Baccarat ceased
> filling Ross-Simons' orders, Ross-Simons already had
> printed and distributed millions of copies of its 1996
> catalog, and that catalog held Ross-Simons out as an
> authorized purveyor of Baccarat crystal.  The court
> found that the inability to supply products as
> advertised would wreak substantial (but immeasurable)
> damage to the goodwill that Ross-Simons painstakingly
> had created over the years.

Id. (footnote omitted).  Even in light of those showings, the

court of appeals deemed the issue of irreparable harm to be a

"close question."   Id.

In Vaquería, the plaintiff milk processors were granted an

injunction requiring a government agency "to establish non-

arbitrary and non-discriminatory regulations to preserve the

solvency of the milk processors, which it found to be in

imminent jeopardy," 587 F.3d at 487.  In affirming, the court of

appeals endorsed the district court's determination that the

plaintiffs were irreparably harmed by milk-pricing regulations,

enforced by the defendant, that effectively required them to

subsidize another milk processor, "thus undercutting their own goodwill by propping up their competitors," id. at 485, with the result that "they have suffered a steady decline in the market for fresh milk and are on the verge of losing their businesses," id.  The appellate court further noted the district court's findings that "[a]fter suffering years of losses, [the plaintiffs'] capital bases have been depleted by five million dollars, and [that the plaintiffs were] on the brink of insolvency."  Id.  Based on the foregoing, the court held:

> Taking into account the rapidly eroding state of the Puerto Rican milk industry, the need for immediate relief, and the likelihood of plaintiffs' success on the merits of their claims, we do not believe the district court abused its discretion in finding that the gravity of these dire circumstances, if allowed to run their course, would constitute irreparable harm, and that their imminence called for preliminary injunctive relief.

Id. at 485-86.

Viewed in the light cast by Vaquería and Ross-Simons, the harm faced by Potts in the absence of the injunction it seeks does not warrant the extraordinary remedy of a mandatory injunction.  In a nutshell, Potts argues that while the property is encumbered by Northgate's mortgage, it is unable to secure the financing necessary to develop the property to the point where it can turn a profit by leasing the property to the other Potts affiliates that operate businesses there.  Potts's claimed

20

inability to secure financing, however, is both speculative and, at least to some extent, self-imposed.

In the affidavit accompanying Potts's complaint, Craig Potts made the following averments:

> In order to maintain and fully develop the Property, [Potts] will need commitments for additional financing.  The additional financing is contingent on the First Mortgage being paid in full and discharged.

> If the First Mortgage is not satisfied and the lien discharged, [Potts] will lose its financing, which will cripple [its] plans to redevelop the Property and result in a loss of the investment made to this point.

> . . . [Potts] cannot prudently invest additional money in, obtain financing commitments for, or secure investments in the Property unless and until the First Mortgage is satisfied, and . . . failure to satisfy the First Mortgage will risk the loss of the entire investment . . .

> . . . .

> Unless and until the First Mortgage is discharged, [Potts] will not hold clear title to the Property, and will be unable to close the additional financing and investments needed to redevelop the business at the Property or otherwise protect its ownership rights and other interest in the Property.

> . . . .

> [Potts] will be irreparably harmed if it is unable to refinance, pay the real estate tax arrearage, or continue to develop the Property because of Northgate's continuing and unlawful refusal to discharge the First Mortgage.

> [Potts] and the businesses at the Property will be economically harmed by the loss of financing and business opportunities unless Northgate is ordered to honor its obligation to discharge the First Mortgage

> in exchange for the $1,027,015.19 tendered by [Potts]
> on February 10, 2012.

Compl., Ex. 8 (doc. no. 1-8) ¶¶ 7-9, 17, 21-22.  At the hearing,
however, Craig Potts placed a notable gloss on his reference to
additional financing being contingent on payment and discharge
of the Northgate mortgage; that "contingency" has not been
imposed by any potential outside lender or investor but by Craig
Potts himself, who, for his own reasons, has declined to move
forward with the mortgage in place.  Potts, however, has
provided no expert testimony regarding the allegedly deleterious
effects of the Northgate mortgage.  See Braintree, 622 F.3d at
42 (noting, with disapproval, the movant's lack of expert
testimony on this issue).  Similarly, at the hearing, Craig
Potts backtracked significantly from his averment that Potts
could "lose its financing," testifying that Potts has not even
attempted to secure financing for the redevelopment of the
property, which means that, as a practical matter, it has no
financing to lose.[10]  As a result, Potts produced no evidence
that the continuing existence of the Northgate mortgage has
scared off any lenders or investors other than Craig Potts, who

---

[10] Because Potts has not attempted to secure financing, it
is a bit of a stretch to assert, as Potts does, that it "has
been stymied in its attempts to secure essential investment and
financing for its expansion projects."  Pl.'s Supp. Mem. of Law
(doc. no. 7), at 7.  If Potts has been stymied, it has stymied
itself.

has testified that he can afford to pay for improving the

property, but declines to do so on principal.  To the extent

that Craig Potts owns Potts, it is reasonable to consider the

lack of investment from Craig Potts to be self-inflicted harm.[11]

But, "[a] preliminary injunction movant does not satisfy the

irreparable harm criterion when the alleged harm is self-

inflicted."  Fiba Leasing Co. v. Airdyne Indus., Inc., 826 F.

Supp. 38, 39 (D. Mass. 1993) (citing San Francisco Real Estate

Investors v. Real Estate Inv. Trust of Am., 692 F.2d 814, 818

(1st Cir.  1982)).  Beyond that, while Potts contends that the

existence of the Northgate mortgage makes it impossible to

secure financing, it is undisputed that at one point, Potts

itself was willing to take a second mortgage on the property,

junior to the mortgage it now says is an insurmountable

impediment to securing investors or financing.

        The bottom line is this.  Like the movants in Braintree who

were denied preliminary injunctive relief, but unlike the movant

in RoDa Drilling which was granted such relief, Potts has

"proffered neither expert testimony nor any data," Braintree,

622 F.3d at 42, that would tend to substantiate the likelihood

---

        [11] Given Potts's steadfast belief in the weakness of
Northgate's claim to repayment for the "principal advances," it
is difficult to see why Potts could not convince its owner that
the existence of the Northgate mortgage for the duration of this
case poses relatively little risk to any investment Craig Potts
might make in Potts.

of irreparable harm if its request for injunctive relief is denied. More specifically, Potts has not demonstrated that its solvency is threatened by the existence of the Northgate mortgage for the relatively short amount of time that resolution of this case is likely to take. See 11A Wright, Miller & Kane, supra, ¶ 2948.1, at 149 ("if a trial on the merits can be conducted before the injury would occur there is no need for interlocutory relief"). And, given that Potts's business consists of leasing the property to other Potts affiliates, Potts has not identified any corporate goodwill that is placed at risk by the existence of the Northgate mortgage.

In sum, Potts's claimed irreparable harm is every bit as speculative as the assertion of harm determined to be insufficient in Braintree. See 622 F.3d at 41 (denying injunctive relief where claimed irreparable harm consisted of "incalculable losses from missed opportunities, including new product acquisitions, in-licensing activities, and research and development programs" resulting from an "ongoing inability to liquidate . . . investments"). Accordingly, Potts's first argument concerning irreparable harm does not support the issuance of the injunction it seeks.

B. Enjoyment of Real Estate

Relying principally on K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907 (1st Cir. 1989) and RoDa Drilling, Potts argues that the circumstances of this case "closely mirror[ ] a myriad of other cases where courts found irreparable harm because an owner of real property was unable to exploit the unique value of that property due to the unlawful acts of another."  Pl.'s Supp. Mem. of Law, at 7.  Potts's reliance on K-Mart and RoDa Drilling is misplaced.

In K-Mart, a tenant in a shopping plaza sued its landlord for violating its lease by starting to construct three buildings in the plaza's parking lot.  875 F.2d at 909-10.  The plaintiff sought injunctive relief,[12] arguing that "the development violated the Lease and harmed [it] in that parking near its store would be reduced; traffic congestion would be increased; [its] store and signage would be obstructed; and in the bargain, the chances of impulse shopping were lessened."  Id. at 910. The district court granted injunctive relief, ordering the landlord to raze one of the three structures "under construction and to replace it with no fewer than 30 parking spaces within 60 days," id. (citation omitted), reasoning that "K-Mart cannot

---

[12] While K-Mart initially moved for a preliminary injunction, and the trial court held a hearing on that motion, it "consolidated the preliminary injunction with the merits." 875 F.2d at 910.

recoup, even through legal damages, the injury to its goodwill
caused by the visual obstruction of its store," id. (citation
omitted).  The court of appeals affirmed, and explained its
determination that K-Mart had established irreparable harm this
way:

> The court below received photographic and testimonial
> evidence that the offending construction blocked
> public view of K-Mart's building from the highway,
> that it interfered with the store's "presence" (an
> item bargained for in the lease negotiations), that it
> lessened available parking, and that it interfered
> with both vehicular maneuverability and pedestrian
> safety.
>
> Mindful of this evidence, we cannot say that the
> district court misused its discretion in determining
> that K-Mart suffered irreparable harm. "District
> courts have broad discretion to evaluate the
> irreparability of alleged harm and to make
> determinations regarding the propriety of injunctive
> relief."  Wagner v. Taylor, 836 F.2d 566, 575-76 (D.C.
> Cir. 1987).  Real estate has long been thought unique,
> and thus, injuries to real estate interests frequently
> come within the ken of the chancellor.  Then, too,
> harm to goodwill, like harm to reputation, is the type
> of harm not readily measurable or fully compensable in
> damages—and for that reason, more likely to be found
> "irreparable."  See Camel Hair and Cashmere Institute
> [of Am., Inc. v. Assoc'd Dry Goods Corp.], 799 F.2d
> [6,] 14-15 [(1st Cir. 1986)] (affirming preliminary
> injunction against sale of mislabelled coats since "a
> lasting but not readily measurable injury can be
> inflicted on a product's reputation by the circulation
> of counterfeit . . . products").  Beyond goodwill, the
> loss of revenues resulting from considerations such as
> diminished visibility, restricted access, less
> commodious parking, and the like are sufficiently
> problematic as to defy precise dollar quantification.

Id. at 915.

In <u>RoDa Drilling</u>, the court of appeals affirmed the grant

of a preliminary injunction ordering "transfer of record title

to [the plaintiff] of all interests, properties, and assets

beneficially held by [the defendant]."  552 F.3d at 1208.

According to the court of appeals:

> The record clearly establishes that RoDa is being
> denied its right to interest in its real property.
> While RoDa provided all of the funds to purchase the
> property — a large but quantifiable amount of money —
> RoDa has been denied unfettered ownership of that
> property, resulting in delays, missed opportunities,
> and, most importantly, unquantifiable damages.  . . .
> RoDa provided expert testimony on the issue of
> irreparable harm and the fact that, at trial, the
> damages suffered absent a preliminary injunction
> likely could not be proven.  . . .  Essentially, while
> being denied record title, RoDa simply cannot
> participate in the everyday operations of its own
> interests, and the damages arising from that denial
> are incalculable.  <u>See</u> <u>Kikumura v. Hurley</u>, 242 F.3d
> 950, 963 (10th Cir. 2001) (noting that "[a] plaintiff
> suffers irreparable injury when the court would be
> unable to grant an effective monetary remedy after a
> full trial because such damages would be inadequate or
> difficult to ascertain").  In sum, these properties
> are income producing, and realizing their income
> potential depends upon active management of the
> properties.  That makes potential damages most
> difficult to prove, if not practically unquantifiable.
>
> As the magistrate judge aptly noted, ownership,
> maintenance, and development of this enterprise is not
> a passive endeavor, and it is increasingly difficult
> for RoDa to manage its properties through an
> intermediary.  . . .  Decisions concerning drilling,
> joint operating agreements, sales, farm-outs,
> operators, and the like must be made day to day.  In
> addition, RoDa has been unable to rely on the
> properties to finance its expenditures, and the
> Internal Revenue Service has indicated that it may
> challenge RoDa's intangible drilling cost deductions
> because RoDa does not hold record title to the

> properties, resulting in severe tax consequences for
> RoDa.  . . .  The magistrate judge's finding that the
> current arrangement is unworkable given the lost
> opportunities and costs and inefficiencies of such an
> arrangement is not clearly erroneous.  Therefore,
> after reviewing the record, we find that the
> magistrate judge did not abuse his discretion in
> finding irreparable harm.

RoDa Drilling, 552 F.3d at 1211.

In K-Mart, the plaintiff's ability to attract customers to its property was significantly impeded.  In RoDa Drilling, the plaintiff was prevented from participating in the everyday operations of several properties it had purchased.  Here, the only thing that Potts cannot do with the property is use $1.2 million of its value as collateral for a loan.  To be sure, the plaintiff in RoDa Drilling was "unable to rely on the properties to finance its expenditures."  552 F.3d at 1211.  But in that case, the plaintiff did not hold title to the properties, see id., and, as a consequence, was completely rather than just partially prevented from using them to secure financing.  And, in RoDa Drilling, the plaintiff's inability to use its properties as collateral was only one of several different limitations on its ability to use the properties at issue. Here, by contrast, the only harm Potts claims is its inability to borrow against the full value of the property for a relatively brief period of time.

28

Because Potts has identified no other way in which its
ability to enjoy its property is compromised by the existence of
the Northgate mortgage, the harm it identifies is essentially
the same harm the court has already determined to be
insufficient to support an injunction based on the loss of
business opportunities.  Accordingly, the fact that the subject
matter of the requested injunction involves real estate is not
enough to establish irreparable harm.

    C. Summary

    Even though Potts has a substantial likelihood of success
on the merits of its claim that it is entitled to a discharge of
the Northgate mortgage, it still must establish that it faces
irreparable harm if the court does not grant the injunctive
relief it seeks.  See Braintree, 622 F.3d at 41; Gately, 2 F.3d
at 1232.  While the threshold is diminished somewhat by Potts's
strong showing on the first element, see Vaquería, 587 F.3d at
485, Potts has not carried its burden on the second element.
Neither Craig Potts's fervent belief in the correctness of his
position nor his understandable desire to have this matter
settled quickly, which were plainly on display at the hearing,
is an adequate substitute for the production of facts supporting

a determination of irreparable harm.  Accordingly, the court should deny Potts the injunction it seeks, and may do so without considering the remaining factors in the preliminary injunction analysis.  See Braintree, 622 F.3d at 41.  Potts is obviously interested in timely relief, and the court has little doubt that it will prevail on the merits, but to be entitled to the mandatory injunction it seeks, Potts must show that "the exigencies of the situation demand such relief."  Id. at 41.  It has not done so.

### Conclusion

For the foregoing reasons, I recommend that plaintiff's motion for a preliminary injunction, document no. 3, be denied.

Any objections to this report and recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011), cert. denied, 132 S. Ct. 1045 (2012); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to magistrate judge's report are subject to review by district

court; issues not preserved by such objection are precluded on

appeal).

_____
Landya McCafferty
United States Magistrate Judge

May 10, 2012

cc:  Peter G. Callaghan, Esq.
     Jack P. Crisp, Jr., Esq.
     Daniel P. Luker, Esq.